UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

REGINA NATHE,                              :   Case No. 1:06-cv-04154 (MBM)

                         Plaintiff,        :   AMENDED COMPLAINT
                                               (JURY TRIAL DEMANDED)
            -against-                      :

WEIGHT WATCHERS INTERNATIONAL, INC.,       :

                         Defendant.        :

------------------------------------X

Plaintiff Regina Nathe, by and through her attorneys Danzig Fishman & Decea, as and for her complaint against defendant alleges, upon information and belief, the following:

1.    This suit is brought to obtain and secure rights granted by the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621 et seq. ("ADEA"), the New York State Human Rights Law ("NYHRL") and the New York State General Business Law, §§349, 350.

2.    This complaint is brought against defendant by reason of certain practices and policies implemented by it which, intended or not, led to the termination of plaintiff in violation of state and federal law. Defendant's policies, in addition to being discriminatory, constituted fraudulent and deceptive advertising which has caused and continues to cause Ms. Nathe and the public at large substantial harm.

JURISDICTION AND VENUE

3.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 and 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c).

THE PARTIES

4.    Defendant Weight Watchers, Inc. ("Weight Watchers"), is a foreign corporation authorized to conduct business in New York State with its global headquarters located at 11 Madison Avenue, 17th Floor, New York, New York 10010.

5.    Defendant is an employer within the meaning of and covered by 29 U.S.C. 630(b) and the New York State Human Rights Law.

6.    Plaintiff Regina Nathe ("Nathe") is a resident of the State of New York who resides at 54 Mountain Rest Road, New Paltz, New York 12561.

7.    Plaintiff is a former employee of Weight Watchers who was a group leader for more than 19 years and who is over the age of forty (40).

8.    At all times relevant hereto until 2004 Nathe was an effective full time group leader who met and exceeded defendant's guidelines or policies for good production and performance by group leaders. Between 1986 and 2004 Nathe received excellent or

very good performance evaluations.

ALLEGATIONS COMMON TO ALL CALIMS

9.   Defendant   employs   approximately   40,000   people
worldwide. Historically the bulk of defendant's work force was
comprised of group leaders who collectively conduct over 46,000
weekly meetings ostensibly to assist defendant's customers to
lose weight and maintain weight loss once the customer's weight
loss goal is achieved.

10.  Since   its   inception   in   the   1960s,   through   2004
defendant generated the majority of its revenue from fees paid
by its customers at the weekly meetings conducted by its group
leaders. The most successful or profitable group leaders were
those who attracted and retained the most customers. Until
defendant began to change its long standing policies, as is set
forth below, trust between its group leaders like plaintiff
herein and its customers was the cornerstone of its business
model.

11.  In the 1990s Weight Watchers was acquired by the H.J.
Heinz Co., whose business is primarily the sale of food
products; after the acquisition defendant was in the retail food
business. Defendant violated the trust of its customers through
the implementation of new policies virtually all of which
derived from the fact that it began to market to its clients and

3

others food products which it labeled under its name and logo.

12.   The new policies included, but were not limited to, requiring group leaders to promote defendant's named food products at group meetings and to sell a certain volume of product at each meeting under threat of termination. The policies included instruction to group leaders on how to push defendant's food products on its customers by exploiting the relationship of trust between them. The group leaders were directed to make material representations that defendant's food products were "healthy" and "essential" to a successful weight loss regimen when defendant's own website advertises that the food products are not necessary for weight loss.

13.   The policies implemented by defendant, as aforesaid, had the effect, intended or not, of reducing the number and percentage of leaders over the age of forty (40) ("Older Leaders"). The practices and policies of defendant, by design or otherwise, had the effect of actually or constructively terminating Older Leaders at a rate disproportionate to those employees not over forty (40) years old.

14. Defendant set out to effectuate its new policy by, among pother things, establishing new food sales performance guidelines and policies which each group leader was required to meet. For her part plaintiff was required to sell $4 of food

4

product to each member at each meeting; she conducted seven (7) meetings per week, fifty two (52) weeks per year with an average of sixty (60) members at each meeting. After the change in policy plaintiff was not only required to conduct meetings and attract members, as she had done successfully for eighteen years, but she was now required to become a salesperson who had to sell an established volume of defendant's food products or be replaced. The change in policy negatively impacted the Older Leaders; they were required to abandon their instructor skills and attempt to sell defendant's food products to their members despite the fact that it was inconsistent with what they had been teaching those same members for years. Moreover, defendant knew the food products were not healthy or essential for effective weight loss and in addition they were exorbitantly expensive. The new policy, obviously designed to increase revenues at the expense of its own customers, pulled the rug out from under Older Leaders like Nathe who had been utterly successful at her trade without the gimmick of fancy food products even if they were healthy which in any event they were not; the food was unhealthy and can lead to many health problems.

15. Nathe was particularly conflicted because her territory was Ulster County whose population consists primarily

5

of lower middle class residents; her long standing customers could not afford to pay for defendant's gimmicky food products. Many of her members participated in her classes as families of four or more; they could not afford to pay $4 extra per person per class in addition to payment of the attendance fees per family member per class (about $10). As a part of its policies designed to peddle its food products defendant implemented performance guidelines as the minimum acceptable goal. Failure of group leaders to achieve the minimum acceptable number of the sales of defendant's food products was grounds for a performance reminder, remedial action, public admonishment and demotion. The employees who could not meet these demands were disproportionately the Older Leaders (because they could not or would not violate the trust of their members) and those Older leaders who had territories in middle and lower middle class neighborhoods. Notwithstanding the foregoing, defendant, on its own website, advertises that its program achieves weight loss without the necessity of purchasing specific foods.

16. When Nathe complained to her superiors about the inability of students to afford the food and the fact that it was unhealthy in any event she was ridiculed, humiliated, admonished and demoted. She was punished and ridiculed when she did not meet the $4 per member per class threshold of food sales

6

required of her.

17. Defendant's new policies did not stop there. In May 1999 defendant also adopted as part of its new policies a compensation system for calculating its vacation bonus allotment. The policy, among other things, provided that employees working an average of eleven (11) meetings a week or more would be entitled to vacation time and bonuses.

18. Prior to the "new" compensation system described above, employees who commenced work prior to on or about 1992 were required to conduct seven (7) meetings a week in order to maintain their status as full time employees and be entitled to benefits including health care and vacation time ("Grandfathered Leaders"); Nathe was among the Grandfathered Leaders. With the introduction of the new system Grandfathered Leaders were disparately treated. For example, Grandfathered Leaders were required to conduct only seven (7) meetings per week but to meet the new rigorous food sales requirements they were forced to conduct additional meetings a month for no extra pay or face termination.

19. Weight Watchers' policies had the effect of targeting Older and Grandfathered Leaders, like Nathe, for increased scrutiny and replacement by younger employees who were required to conduct at least eleven (11) meetings per week for the same

7

wage. Under the policies above described Older Leaders, and in particular Grandfathered Leaders, were less favorably treated than younger leaders. Some Older Leader quit. In most instances, however, the policies, when successfully implemented, resulted in the Older Leaders being constructively terminated so that like in the case of Nathe defendant could assert after the fact that they resigned.

20. The policies and procedures adopted by defendant described above, whether intended or not, resulted in a disproportionate share of Older Leaders and Grandfathered Leaders being terminated either overtly or constructively.

21. Defendant's new policies and procedures resulted in the allocation of jobs away from Older Leaders to newer and younger leaders who did not have the customer relationships of the Older Leaders and who, therefore, were not being asked to sell-out their customers; they were hired to sell and didn't know any better.

22. This policy and others were tantamount to a new compensation system which had the effect of conferring benefits to younger group leaders while simultaneously punishing Older Leaders although both groups of leaders were similarly situated.

23. The newly minted policies and procedures resulted in Older Leaders being more supervised and subject to discipline

than their younger counterparts. Under the policies and procedures, Weight Watchers gave young inexperienced leaders, including part-time leaders who often worked on a full time basis, preferential treatment in meeting assignments over the Older Leaders who of course were more experienced so that they would meet or exceed the stated minimum amount of food sales required for continued employment.

24. Defendant has, starting from sometime in 1999, to date implemented a pattern or practice of employment procedures that discriminate because of age against plaintiff and other similarly situated employees over forty (40) years old in favor of less experienced and less expensive younger leaders. The policies also had the effect of eliminating the Grandfathered Leaders or requiring them to work almost twice as much for the same pay which was a constructive termination. In addition to the discriminatory practices described above defendant also: (i)redistributed working hours from Grandfathered Leaders to younger leaders; (ii) created artificial productivity goals for Grandfathered Leaders without similar increases for younger leaders; (iii) required evaluations of Grandfathered Leaders and criticized their performance, while letting younger leaders go without check or with fewer evaluations; (iv) cited Grandfathered Leaders for alleged violations of rules while

9

ignoring similar or more severe violations of such rules by younger leaders; (v) terminated Grandfathered Leaders "for cause" for minor infractions or for no infractions of the rules while favoring younger employees in such matters; and (vi) disciplining or terminating Grandfathered Leaders for failure to meet artificial productivity goals and then giving their meetings to younger leaders who did not have to abide by the same artificial productivity goals.

25. Employment practices that discriminate against Older Leaders and favor younger ones, as described above, are the prevailing pattern and practice of defendant at least in the United States; this pattern or practice is not limited to one region, district or state. Defendant has continued to follow that pattern or practice to this day and has no plans to end the pattern or practice.

26. Weight Watchers' pattern or practice of discriminating Older Leaders and in favor of younger leaders has become the rule and not the exception at Weight Watchers.

27. Defendant has engaged in employment practices that have harmed plaintiff by the loss of income and benefits to say nothing of self esteem. Since plaintiff was terminated she has been contacted by many of her class members who have inquired as to whether or not she would be returning.

10

28. The policies and practices described hereinabove were not consistent with business necessity.

29. Unless restrained by order of this Court the defendant will continue to pursue policies and practices that are the same, or similar or related to the policies and practices alleged in this complaint. Such policies and practices have caused plaintiff and other Older Leaders and Grandfathered Leaders similarly situated irreparable harm.

30. Weight Watchers holds itself out as a leader in the multibillion dollar weight loss industry. It represents to its customers and the public at large that (i) a healthy diet is the key to weight loss and maintenance; (ii) its food products are part of a healthy diet; (iii) the purported nourishment value of its food products is based on solid science. In a purported effort to provide healthy dietary guidance to its clients, Weight Watchers has disseminated and continues to disseminate dietary information at its meetings and on its website which include, among other things, proper eating habits and nutrition.

31. Defendant advertises on its website and elsewhere that customers will learn the tools necessary to lose weight by attending weekly meetings and that the Weight Watchers method does not require specific food purchases; while they so advertise they simultaneously require their instructors, like

11

plaintiff, to sell at least $4 of food products per person per meeting. If all this were not enough, while defendant's self-professed dietary objectives is to provide "science-based, weight-loss programs that are safe, healthy, and effective", it is actively misleading the public and its customers by promoting and selling food products which contain harmful food additives such as trans fat and other saturated fats, high fructose corn syrup and partially hydrogenated oils which are generally considered to be unhealthy and lead to a myriad of health problems including high cholesterol, high blood pressure and heart disease.

32. Not only are these processed ingredients documented as being harmful to good health but they are in direct contravention of the published objectives of Weight Watchers.

33. The misrepresentations regarding its food products must be made by all of its group leaders and are intended to induce, and certainly have the effect of inducing, customers to purchase the products; group leaders are then graded and promoted in accordance with their success in the sale of defendant's food products which comprises nearly 50% of its revenue.

34. As a condition of the continued employment of group leaders by defendant, Weight Watchers requires leaders to make

12

material misrepresentations to its clients concerning these products including but not limited to stating that: "the products will help achieve your weight loss goals"; "they are healthy and nutritious"; "are part of a balanced diet"; and "are a healthy alternative to other snack foods."

35. These representations are required to be made by leaders at Weight Watchers meetings to induce customers to purchase the products and have in fact induced the purchase of the products by Weight Watchers clients.

36. The representations are false and known by Weight Watchers to be false because many of the food products contain artificial additives including trans fat and other saturated fats, high fructose corn syrup and partially hydrogenated oils, all of which are harmful to health and to a healthy diet.

37. Weight Watchers is exploiting its brand name and the trust of its customers to deceive them and the public with respect to the effect of consuming its otherwise harmful products in an effort to increase its profits by the sale of such products. Plaintiff and the consuming public have been and continue to be misled by defendant through group meetings, promotions, brochures, press releases, statements and its website, by advertising that its snack foods are healthy and will result in weight loss when the food is unhealthy and does

13

not promote weight loss.

AS AND FOR A FIRST CLAIM

38.   Plaintiff   repeats   and   reiterates   each   of   the allegations contained in paragraphs 1 through 37 above as if set forth at length here.

39.   Defendant purposefully engaged in the practices described above in paragraphs 10 to 29 with full knowledge that they   discriminated   against   Older   Leaders   and   Grandfathered Leaders.

40.   Defendant   Weight   Watchers   engaged   in   the discriminatory employment practices that harmed plaintiff with disregard for her rights under the ADEA.

41.  Ms. Nathe was employed by defendant on or about March, 1986, through and including the date of her termination on or about February 9, 2005.

42.  Ms. Nathe was employed as an instructor or "leader" by Weight Watchers.

43. On or about February 1, 2005, Ms. Nathe was informed by defendant that her services were no longer required due to her alleged "failure to meet performance standards," although she was asked to stay on for several days.

44.  Ms. Nathe was dismissed by defendant due solely to her age and without any other cause contributing thereto.

14

45. Ms. Nathe was one of the most senior employees in her region (Ulster County, New York).

46. During the entire period of her employment by Weight Watchers, Ms. Nathe performed her work in a more than satisfactory manner.

47. Defendant hired a younger person (under the age of forty), to replace Ms. Nathe.

48. Ms. Nathe has been unable to secure new employment after her dismissal by Weight Watchers.

49. Weight Watchers' actions as complained of herein constitute unlawful discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 and Title VII of the Civil Rights Act of 1964, 42 USC § 2000e.

50. The actions of Weight Watchers were willful and in utter disregard for the welfare of Ms. Nathe, other employees of Weight Watchers and the public at large. Weight Watchers' action were also without reason or basis and were so arbitrary, capricious and unfounded that Ms. Nathe was thereby denied due process of law. Ms. Nathe exhausted her administrative remedies by the timely filing of a complaint with the EEOC and otherwise meets all of the prerequisites for the filing of a suit under the ADEA and the NYHRL.

51. By reason of the aforesaid termination of Ms. Nathe by

15

Weight Watchers, she has suffered loss of income and benefits and was caused mental anguish.

52.   Accordingly, plaintiff is entitled to a money judgment against defendant in an amount to be determined at the trial of this action but presently believed to be $2,000,000, plus interest, costs and attorneys' fees, incurred by Ms. Nathe including those costs and expenses which will continue to accrue during the pendency of this action.

AS AND FOR A SECOND CLAIM

53.   Plaintiff   repeats   and   reiterates   each   of   the allegations contained in paragraphs 1 through 52 above as if set forth at length here.

54.   Weight Watchers' actions as complained of herein constitute unlawful discrimination in violation of the New York Human Rights Law.

55.   Accordingly, plaintiff is entitled to a money judgment against defendant in an amount to be determined at the trial of this action but presently believed to be $2,000,000, plus interest, costs and attorneys' fees, incurred by Ms. Nathe including those costs and expenses which will continue to accrue during the pendency of this action.

AS AND FOR A THIRD CLAIM

56.   Plaintiff   repeats   and   reiterates   each   of   the

16

allegations contained in paragraphs 1 through 55 above as if set forth at length here.

57. Since in or about 2004, Weight Watchers has been marketing and selling food products such as nutrition bars, breakfast bars and other snack foods in commerce: to its clients and the public at large.

58. Weight Watchers through, inter alia, its leaders advertises these products as being healthy aids to weight loss. In fact, many of these food products contain artificial additives including trans fat and other saturated fat, high fructose corn syrup and partially hydrogenated oils which are unhealthy and would retard weight loss.

59. Weight Watchers is using its good name as a provider of health and weight management and its clients' trust to deceive its clients and the public at large with respect to the effect of consuming these harmful products in an effort to increase its profits by the sale of these products.

60. Relying on the brand name of defendant and on the continuing education lectures of various "experts" retained by defendant to give such lectures to group leaders, Nathe purchased some of Weight Watchers' snack products. After her purchase, she determined that the snacks were in fact unhealthy and contrary to the healthy diet and eating goals promulgated by

17

Weight Watchers since the products contained harmful food additives.   In an effort to prevent the dissemination of these products to plaintiff's customers and to the consuming public at large, after her discovery, plaintiff spoke out against the snack foods at management meetings.   Unfortunately, plaintiff was quieted down at management meetings and labeled a troublemaker for her efforts. Her opinion concerning these products may have contributed to her termination.

61.   Not only has plaintiff been harmed by consuming these products, prior to realizing their contents and their harmful effect, but Weight Watchers' clients and the public at large are being deceived into purchasing these foods believing they are healthful and will aid in weight loss.

62.   Weight Watchers' actions as complained of herein constitute deceptive acts and practices in violation of § 349 and deceptive advertising in violation of §350 of the New York General Business Law.

63.   Accordingly, plaintiff is entitled to a judgment enjoining the sale of these harmful products, and to a money judgment in an amount to be determined at the trial of this action but presently believed to be $2,000,000, plus interest, costs and attorneys' fees incurred by Ms. Nathe including those costs and expenses which will continue to accrue during the

18

pendency of this action and punitive damages in an amount to be determined by the Court.

WHEREFORE, plaintiff Regina Nathe demands judgment against defendant Weight Watchers International, Inc., as follows:

(i)     On her first claim awarding to plaintiff a money judgment against defendant in an amount to be determined at the trial of this action but presently believed to be in excess of $2,000,000 plus interest, costs and attorneys' fees;

(ii) On her second claim awarding to plaintiff a money judgment against defendant in an amount to be determined at the trial of this action but presently believed to be in excess of $2,000,000 plus interest, costs and attorneys' fees;

(iii) On her third claim awarding to plaintiff a judgment enjoining the sale of these harmful products, and a money judgment in an amount to be determined at the trial of this action but presently believed to be $2,000,000, plus interest, costs, attorneys' fees and punitive damages in an amount to be determined by the Court; and

19

(iv) For such other and for relief as to this Court may seem just and proper.

Dated: White Plains, New York
       September 1, 2006

                        DANZIG FISHMAN & DECEA

                        By:_____/s/_____
                            THOMAS B. DECEA (TD 9105)
                            YENISEY RODRIGUEZ-MCCLOSKEY(YM3815)
                        Attorneys for Plaintiff
                          Regina Nathe
                        One North Broadway
                        White Plains, NY 10601
                        (914) 285-1400

20

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of September 2006, I caused a true and correct copy of the foregoing plaintiff's amended complaint to be served by electronic filing along with a courtesy copy by first class mail upon the following party:

Paul Blankenstein, Esq
Of Counsel
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, District of Columbia 20036

_____/s/_____
YENISEY RODRIGUEZ-MCCLOSKEY (YM 3815)

H:\48222/0000/00004919.Doc

2