IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| REGINA NATHE, | § § § § | Case No. 1:06-cv-04154-DAB/DFE |
| *Plaintiff,* | § § | |
| v. | § § | |
| WEIGHT WATCHERS INTERNATIONAL, INC., | § § § | |
| *Defendant.* | § § | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF WEIGHT WATCHERS INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant Weight Watchers International, Inc. ("Weight Watchers") submits this Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 in support of its Motion for Summary Judgment. As set forth below, there is no genuine issue of material fact as to the following facts, and such facts entitle Weight Watchers to judgment as a matter of law on each of plaintiff's claims.

1. Regina Nathe was employed by Weight Watchers International, Inc. "Weight Watchers" from 1987 to February 2005. (Nathe Dep. 20:2-3, attached as Exhibit A to Declaration of Jennifer J. Schulp in Support of Weight Watchers International, Inc.'s Motion for Summary Judgment ("Schulp Decl."); *id.* 165:21-25.)

2. The only position Nathe ever held at Weight Watchers was as a "Leader." (*Id.* 20:10-12.)

3. In her position as a Leader, Nathe reported to a territory manager. (*Id.* 20:13-16.)

4. Renee Milstein became the territory manager to whom Nathe reported in early 2004. (Milstein Dep. 5:25-6:6, attached as Exhibit B to Schulp Decl.)

5. During the entire time that Nathe was a Leader, her immediate supervisor—the territory manager—reported to a district manager, Ilene Brannigan. (Nathe Dep. 21:13-17.)

6. Leaders have several job responsibilities, including facilitating meetings, answering questions from Weight Watchers members, explaining the Weight Watchers program to members, making Weight Watchers' products available for sale at the meetings, and promoting the use of those products by members where appropriate. (*Id.* 44:2-45:7; *id.* 102:24-103:5; Milstein Dep. 114:17-25)

7. Leaders receive regular coaching from supervisors and specialists from the Weight Watchers training department regarding their performance. (McCarthy Dep. 37:9-16, attached as Exhibit C to Schulp Decl.; Nathe Dep. 66:16-17.)

8. Beginning in 2000, Cathy McCarthy was the training specialist assigned to Nathe's geographic area. (Nathe Dep. 22:13-23:8.)

9. Coaching consists of observation of the Leader's meeting and often includes written evaluations of the Leader's performance. (McCarthy Dep. 37:2-13; Brannigan Dep. 37:8-13, attached as Exhibit D to Schulp Decl.)

10. One-on-one feedback between the supervisor and/or specialist and the Leader is also often provided as part of the coaching. (Brannigan Dep. 38:20-39:2; *id.* 48:23-25; Nathe Dep. 49:2-6.)

11. Additional coaching may be scheduled with Leaders based on defects in the Leader's performance during the meeting observed. (Brannigan Dep. 37:8-13; *id.* 41:15-23.)

12. Weight Watchers offers many avenues to help Leaders improve their skills, including offering group training to Leaders on particular topics. (Brannigan Dep. 54:4-9; Nathe Dep. 47:18-49:16.)

13. From at least February 2002, evaluations of Nathe during the coaching sessions by her supervisors and training specialists were mixed. (Milstein Dep. 121:16-25; McCarthy Dep. 87:23-88:17.)

14. Nathe received praise for performing certain tasks well. (McCarthy Dep. 52:2-9; *id.* 99:4-14.)

15. Among other things, Nathe was criticized for not adhering to the Weight Watchers' program in presentations to members at meetings. (McCarthy Dep. 34:3-17; *id.* 87:23-88:17; *id.* 108:10-109:2.)

16. Nathe was also criticized for her advocacy of non-Weight Watchers approved nutritional approaches during her meetings. (Nathe Dep. 69:5-70:25; McCarthy Dep. 34:3-17)

17. Nathe was also criticized for her reluctance to integrate products into her meetings. (Nathe Dep. 114:18-115:3; *id.* 115:11-16; *id.* 116:22-117:15; *id.* 118:7-12; Milstein Dep. 105:24-106:5.)

18. The entire time she was employed by Weight Watchers, Nathe was required to lead seven meetings per week in order to be eligible for full-time benefits. (Nathe Dep. 29:12-13.)

19. Weight Watchers implemented a policy effective June 1994 requiring Leaders hired after 1991 to lead eleven meetings per week in order to be eligible for full-time benefits; Leaders hired prior to 1991 were exempted from this policy, and could continue to lead seven

3

meetings per week to be eligible for full-time benefits. (Benefits Eligibility Notice, attached as Exhibit E to Schulp Decl.; Brannigan Dep. 109:23-110:12; *id.* 118:8-11.)

20. Weight Watchers compensates Leaders on a per meeting basis. (Nathe 42:5.)

21. During the entire time that Nathe was employed as a leader, Weight Watchers sold products in its meetings. (Brannigan Dep. 58:18-20.)

22. The products available for sale have varied over the years, and have included cookbooks, scales, and food products. (Brannigan Dep. 58:23-59:9; McCarthy Dep. 79:10-15.)

23. Weight Watchers food products are intended to be a tool that members can utilize as part of the program. (Milstein Dep. 58:25-59:6; McCarthy Dep. 79:10-17; Gordon Dep. 7:24-8:2, attached as Exhibit F to Schulp Decl.; Brannigan Dep. 60:9-10.)

24. Weight Watchers does not require members to purchase food products as a part of the program. (McCarthy Dep. 73:15-17; Gordon Dep. 58:9-12.)

25. Weight Watchers' food products are portion-controlled. (McCarthy Dep. 29:13-14; *id.* 79:15-17.)

26. Many Weight Watchers' food products are marketed as substitutes for other snack products (such as candy bars). (Milstein Dep. 36:25-37:4; McCarthy Dep. 79:18-80:6.)

27. On January 19, 2005, Nathe led a meeting that was observed in part by her direct supervisor (territory manager Renee Milstein) and the district manager (Ilene Brannigan). (Milstein Dep. 13:7-14:7.)

28. After the January 19 meeting, Ms. Milstein had a conversation with Nathe, during which she suggested that Nathe attend the Weight Watchers' Basic Leader Skills training course. (Nathe Dep. 100:18-101:5; Milstein Dep. 10:20-11:3.)

29. The Basic Leader Skills course includes training on the current Weight Watchers program, Weight Watchers' products, and effective presentation techniques. (McCarthy Dep. 54:8-24.)

30. Nathe last attended the Basic Leader Skills course in 1986. (Nathe Dep. 160:4-9.)

31. Nathe refused to attend the Basic Leader Skills course when requested in 2005. (*Id.* 100:18-101:9.)

32. Nathe conducted her last meeting as a Weight Watchers Leader on February 8, 2005. (*Id.* 165:21-25.)

33. In 2001, the percentage of Leaders over the age of 40 in the Weight Watchers' Eastern Region was 75%. (2001-2005 Leader and Receptionist Employment Data, attached as Exhibit G to Schulp Decl.)

34. In 2004 and 2005, 81% of Weight Watchers' Leaders in the Eastern Region were over the age of 40. (*Id.*)

35. Nathe consumed certain Weight Watchers snack bars, baked snacks, and Fruities (fruit snacks). (Nathe Aff. ¶ 1, attached as Exhibit H to Schulp Decl.; Nathe Dep. 182:11-186:17.)

36. Nathe received some of these food products as samples in her capacity as a Leader and independently purchased and consumed others. (Nathe Dep. 187:10-22.)

37. Nathe tried many of the Weight Watchers products so that she could give opinions to members about the products. (*Id.* 186:20-22.)

38. Nathe views herself as knowledgeable about nutrition. (*Id.* 200:10-13.)

39. As plaintiff's proffered expert, Ms. Nancy Case, acknowledged, information about the ingredients of the food products sold by Weight Watchers is included on the label, in

5

accordance with FDA labeling regulations. (Case Dep. 112:17-24, attached as Exhibit I to Schulp Decl.; Gordon Dep. 31:9-11.)

40. Nathe decided that Weight Watchers' products were "unhealthy" by reading their labels. (Nathe Dep. 200:14-20.)

41. Nathe admits that she is "not quite affected by commercials" and "make[s] decisions based on what [she] knows, not what the commercial tells [her]." (*Id.* 235:7-11.)

42. Nathe has consumed food products not produced by Weight Watchers that contained the ingredients she cites as "unhealthful." (*Id.* 233:7-13.)

43. Nathe's personal physician, Dr. Rosemary DeLeo, described Nathe as generally "healthy". (DeLeo Dep. 12:5-6, attached as Exhibit J to Schulp Decl.)

44. Nathe does not have high blood pressure, thyroid problems, or indicators of heart disease. (*Id.* 23:21; *id.* 57:19-58:4; *id.* 58:5-7.)

45. Nathe has a family history of high blood pressure, high cholesterol, diabetes, and heart disease. (Nathe Dep. 227:2-19.)

46. To the extent that plaintiff has high cholesterol, Dr. Deleo attributes Nathe's high cholesterol to her genetics. (DeLeo Dep. 54:23-24.)

47. As plaintiff's putative expert, Ms. Case, acknowledged, Weight Watchers markets its products within the context of its overall weight-loss program. (Case Dep. 240:22-241:4.)

48. There is no universally accepted scientific consensus as to what constitutes a "healthy diet." (*Id.* 296:9-20.)

49. There is "room for discussion" about "what constitutes a healthy food or a nutritious food." (*Id.* 169:21-170:24.)

50. "[H]ealthy foods cannot be defined by any one standard." (*Id.* 297:6-10.)

51. "There actually is no technical [meaning] or a description" for "nutritional." (*Id.* 132:16-20.)

52. The Dietary Guidelines for Americans 2005, published by the U.S. Department of Agriculture, incorporate the concept of discretionary calories as part of a weight-loss plan. (*Id.* 270:7-271:13.)

53. Discretionary calories are, within the certain allotment of calories that the individual chooses, what one chooses to consume after one's minimum individual needs are otherwise met by healthful sources of nutrients. (*Id.* 270:22-271:13.)

54. The food that a consumer uses as discretionary calories is often some sort of sweet or other food that has no nutrients (other than carbohydrates), but may offer relief from the rigors of the diet and may thereby enhance the individual's compliance with a weight-loss program. (*Id.* 271:14-272-25.)

55. "[T]he discretionary-calorie allowance allows individuals flexibility to consume some foods and beverages that may contain added fats, added sugars, and alcohol." (*Id.* 288:3-9.)

56. The Dietary Guidelines for Americans 2005 do not preclude discretionary calories consisting entirely of sugar, as long as basic nutritional needs are otherwise met. (*Id.* 291:15-292:4.)

57. "[N]o numerical recommendation or quantification" exists for the amount of sugar a product may contain before being considered "unhealthy." (*Id.* 166:14-21.)

58. Saturated fats and trans fats result in negative health effects when they constitute more than one-third of total fat consumption . (Nathe Dep. 215:2-7; *id.* 214:5-11.)

59. The Dietary Guidelines for Americans 2005 recommend a reduction, but not an elimination, of saturated fats and sugar. (Case Dep. 145:4-12.)

60. Consuming one bag of Weight Watchers' cheddar twists or honey mustard pretzels would not exceed an individual's daily sodium limit. (*Id.* 283:12-17.)

61. Using solely calories as a criterion, all of the products Nathe consumed qualify as "discretionary calories" under the Dietary Guidelines for Americans 2005. (*Id.* 327:19-24.)

62. The record evidence does not establish that the presence of any individual ingredient in the Weight Watchers' products about which plaintiff complaints is sufficient to make that product unhealthy or not nutritious:

> a. Ms. Case is unaware of any data or studies indicating long-term adverse health consequences to the general population from soy products. (*Id.* 210:3-6.)
>
> b. Potential negative effects of yellow dyes 5 and 6 are speculative. (*Id.* 257:3-258:11.)
>
> c. Maltitol and aspartame are not of concern, except to those with a particular sensitivity to it. (*Id.* 259:8-260:7.)
>
> d. Acesulfame K has not been shown to cause cancer. (*Id.* 262:5-11, 265:10-266:23.)

63. Ms. Case did not review any of the underlying research discussed in the articles and abstracts upon which she relies, and does not have any knowledge of the protocols and empirical data involved in the research upon which she relies. (*Id.* 89:9-95:13; *id.* 178:8-181:10; *id.* 193:7-202:20.)

Dated: March 27, 2009                    Respectfully submitted,

    /s/ Paul Blankenstein
William J. Kilberg, P.C. (WK-0792)
   wkilberg@gibsondunn.com
Paul Blankenstein (PB-8583)
   pblankenstein@gibsondunn.com
Jennifer J. Schulp (*pro hac vice*)
   jschulp@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Defendant*
*Weight Watchers International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of March, 2009, I caused true and correct copies of the foregoing Statement of Undisputed Material Facts in Support of Weight Watchers International, Inc.'s Motion for Summary Judgment to be served via electronic filing upon the following:

>Thomas B. Decea
>Yenisey Rodriguez-McCloskey
>Danzig, Fishman & Decea
>One North Broadway
>Suite 1202
>White Plains, New York 10601

>>/s/ Paul Blankenstein
>>Paul Blankenstein